UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| BRIAN LAMAR BROWN, | Case No. 2:02-cv-00770-GMN-PAL |
| Petitioner, | |
| v. | ORDER |
| ATTORNEY GENERAL FOR THE STATE OF NEVADA, et al., | |
| Respondents. | |

This matter comes before the Court on consideration of the merits of the remaining claims in petitioner's original petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5 & ECF No. 19 at 8). Respondents have answered (ECF No. 85), and petitioner has replied (ECF No. 93).

**Factual and Procedural Background**

Petitioner herein challenges his conviction pursuant to a jury trial of second degree murder with the use of a deadly weapon and attempted murder with the use of a deadly weapon. (*See* ECF No. 5).

On the evening of January 18, 1996, petitioner and his friend, Daniel Hill, met with Randy Beach and Jason Banks at Stewart Park. (Ex. 57 (Tr. 60-61); Ex. 58 (Tr. 18)).[1] Hill and Beach were meeting to argue over a debt Beach owed Hill. (Ex. 57 (Tr. 72-73); Ex. 58 (Tr. 25-26)). Beach and Banks, who were friends, arrived together in Beach's car. (Ex.

_____

[1] The exhibits cited in this order, which comprise the state court record, are located at ECF Nos. 38, 39 and 41-47.

57 (Tr. 60-61)). Petitioner, who did not know Beach or Banks, arrived with Hill in Hill's car. (Ex. 57 (Tr. 72); Ex. 58 (Tr. 27)). Both parked their cars on the west side of the park, which had a brick wall running north to south along its western edge. (Ex. 57 (Tr. 62-63, 66, & 89-90)).

The four met on the basketball court – on the other side of the wall -- where Beach and Hill proceeded to have a verbal altercation for about ten to twenty minutes. (Ex. 57 (Tr. 68); Ex 58 (Tr. 161)). During this time, petitioner walked around them, occasionally speaking up to take Hill's side. (Ex. 57 (Tr. 69); Ex. 58 (Tr. 67, 162-63, 189)). When the argument ended, Beach and Banks were to the north and Hill was to the south; Hill turned to begin walking south while Banks and Beach turned to begin walking north/northwest. (Ex. 57 (Tr. 67, 92); Ex. 58 (Tr. 48-47, 52, 54, 79, 86, 164, 166, 174-75)). As they were walking away, Hill and petitioner claimed they heard Banks or Beach say "Let's do it." (Ex. 58 (Tr. 52). Beach denied saying this. (Ex. 57 (Tr. 101-02)). Petitioner, who was either south of Banks and Beach or somewhere to their north, pulled out a gun from his back waistband and fired shots at Banks and Beach. (Ex. 57 (Tr. 91-92); Ex. 58 (Tr. 174-75, 191, 196-97)). Banks was hit in the front, right part of his chest. (Ex. 61 (Tr. 170)). Beach was shot in his back. (Ex. 57 (Tr. 70, 95)). Beach saw Banks fall and then began to run. (Ex. 57 (Tr. 70); Ex. 58 (Tr. 192)).

Petitioner chased after Beach, firing several more shots. (Ex. 57 (Tr. 70); Ex. 58 (Tr. 164-65)). He caught up with Beach on the porch of a nearby house. (Ex. 57 (Tr. 70)). He told Beach to give him his car keys, which Beach did, and then began pulling Beach toward the cars. (Ex. 57 (Tr. 70-71); Ex. 58 (Tr. 105-06)). At the same time, Hill was helping Banks into his car. (Ex. 57 (Tr. 75)). Beach got into Hill's car and Hill drove Banks and Beach to the hospital, where Banks died. (Ex. 57 (Tr. 75-77); Ex. 58 (Tr. 91)).

In the meantime, petitioner got into Beach's car and began to idle down the street. (Ex. 58 (Tr. 92); (Ex. 62 (Tr. 56-57)). Shortly after the shooting, police located petitioner near the park, still in Beach's car, and arrested him. (*Id.* at 202-07).

On January 22, 1996, petitioner was charged by way of criminal complaint with one count of first degree murder with use of a deadly weapon, one count of attempted murder with use of a deadly weapon, and one count of grand larceny. (Ex. 2). Trial on the charges commenced on September 16, 1996. (Ex. 57).

At trial, petitioner argued that he acted in self-defense, an argument based in part on a claim that the victims had come after him, and in part on a claim that petitioner was suffering from a diabetes-related insulin reaction that confused him or caused him to misread the situation. Although petitioner did not testify, his interview with police following his arrest was shown.[2] (*See* Ex. 62 (Tr. 8)). During the interview, petitioner stated that he was an insulin dependent diabetic and that although he felt a little shaky he could continue with the interview. (ECF No. 43-4 (Ex. 98C at 9-10)). He also stated, at least twice, that he hadn't felt good most of the day and couldn't remember a lot of what happened. (*Id.* at 10-11). Asked if he ever had blackouts, petitioner said he frequently did. (*Id.* at 10). Asked if he had been frightened, petitioner said he had been. (*Id.* at 12) Petitioner then remembered being in the park and that one of the guys really wanted to fight. (*Id.*) He remembered this person calling him and Hill a "b***h" and a "punk." (*Id.*) He recalled that one of the guys said something like, "F*** it; let's do it," which made him feel "disturbed." (*Id.*) Petitioner then remembered shooting the gun but claimed he had been trying to shoot past the victims and that he had not shot anyone. (*Id.*) When asked if the shooting might have been in self-defense -- if he might have been afraid of the victims -- petitioner stated he felt that one of the victims was coming at him so he shot him. (*Id.* at 13). Petitioner stated that he had gone to the park with Hill as back-up and he took his gun because he felt he might need it. (*Id.*) He said one of the victims was hostile and wanted to fight. (*Id.*) He said that when one of the victims said "let's do it," he turned around and saw that

---

[2] The interview was not transcribed as part of the trial transcript, and the Court has been unable to locate the full transcript of the interview elsewhere in the record. However, the police summary of the interview is in the record. (ECF No. 43-4 (Ex. 98C)). Defense counsel quoted the summary in briefs filed with the trial court (*see* Ex. 56), and the summary is consistent with arguments made by both counsel during the course of trial. The Court therefore concludes that the summary is sufficient to evaluate the nature of the statements petitioner made during his interview, which were presented to the jury during trial.

person walking toward him, looking "real crazy," so he pulled out his gun and fired. (*Id.*) When asked if it bothered him that he was called a "b***h" and a "punk," petitioner admitted it made him angry but he denied that that was the reason he shot the victims. (*Id.*) At one point, petitioner told the police that both subjects were coming in his direction and he shot in self-defense; he said he felt he didn't have a choice. (*Id.* at 14).

Petitioner also called an expert witness, Dr. Bittker. Dr. Bittker testified that petitioner suffered from "the most fragile, the most brittle, the most severe" type of diabetes. (Ex. 64 (Tr. 11)). He explained that if a person in petitioner's situation has too much insulin and not enough food in his system, he can have an insulin reaction, symptoms of which can include shakiness, feelings of weakness, fatigue, irritability, difficulties with coordination, and difficulties with visual motor coordination and making visual judgments; he further said that "sometimes people even distort what they see as a consequence of this kind of state, and when one is in this state we get to a point where the brain suffers from what we call a delirium." (*Id.* at 12-13). Dr. Bittker opined that, based on how much insulin and food petitioner reported having that day, along with petitioner's behavior during his interview with police, petitioner was likely suffering from an insulin reaction the evening of January 18, 1996. (*Id.* at 12-14). The prosecutor engaged in a lengthy cross-examination of Dr. Bittker during which he challenged the doctor's conclusions. (*See* Ex. 64 (Tr. 17-96 & 114-21)).

Following a six-day trial, petitioner was convicted of second degree murder with a deadly weapon and attempted murder with a deadly weapon and acquitted of grand larceny. (Ex. 68). On December 2, 1996, petitioner was sentenced to a prison term of ten years to life on the second degree murder charge with a consecutive like term for the use of deadly weapon, and a prison term of four to twenty years on the attempted murder charge with a consecutive like term for the use of a deadly weapon. (Exs. 75 & 76). Petitioner appealed, and the Nevada Supreme Court affirmed. (Exs. 77, 81 & 84).

On June 30, 2000, petitioner filed a state petition for writ of habeas corpus. (Ex. 96). After an evidentiary hearing (Ex. 115), the state district court denied the petition. (Ex. 117). On appeal, the Nevada Supreme Court affirmed. (See Exs. 119, 136 & 159).

Thereafter, petitioner filed his federal petition for writ of habeas corpus in this court. (ECF No. 5; *see also* ECF No. 19 at 9-15 (Ground IA)). Following various proceedings, the surviving claims of the original petition come before the Court for consideration on the merits.

**Standard**

28 U.S.C. § 2254(d) provides the legal standards for this court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Andrade*, 538 U.S. 63 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

As the Nevada Supreme Court reached the merits of petitioner's claims, its decisions are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, -- U.S. --, 135 S. Ct. 2187, 2208 (2015).

**Analysis**

The petitioner's remaining claims are as follows:

Ground 3:    The prosecutor committed misconduct in closing arguments by misstating facts that had been presented to the jury;

Ground 4:    The trial court violated petitioner's rights when it refused to allow evidence of specific acts regarding the character of the victims pursuant to Nev. Rev. Stat. § 48.055(2);

Ground 5:    The trial court violated petitioner's rights by refusing to give the defense's proffered self-defense jury instructions;

Ground 6:    The trial court violated petitioner's rights by refusing to give a jury instruction regarding the burden of proof on the prosecution;

Ground 17:    Trial counsel rendered ineffective assistance of counsel by failing to move to dismiss the charge of larceny after the Justice Court abused its discretion by binding over the larceny charge based on a "substantial mistake of fact"; and

Ground 1A:    The trial court erred in denying petitioner's habeas claim that he was improperly denied a jury instruction critical to his theory of the case.

**I.    Ground 3**

In Ground 3, petitioner asserts that during closing arguments, the prosecutor made several misstatements of fact and disparaged petitioner's witnesses, thereby violating his due process rights. Specifically, petitioner asserts that the prosecutor: (1) repeatedly stated the victims were shot in the back; (2) misstated the testimony of eyewitnesses

Michelle Marlette and Robin Skipworth; (3) misrepresented forensic evidence; (4) misstated who evinced certain testimony from Marlette; (5) stated that gunpowder residue was taken from the back of the victims' hands when no such evidence was in the record; and (6) made inappropriate disparaging remarks about petitioner's medical expert, Dr. Bittker, in an effort to discredit him. (ECF No. 5 at 9-18).[3]

A defendant's constitutional right to due process of law is violated if the prosecutor's misconduct renders a trial "fundamentally unfair"; thus, a prosecutor's improper comments amount to a constitutional violation if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986). However, even if there was a constitutional violation, a petitioner is entitled to relief only if he was actually prejudiced by the comments. *Id.* (citing *Ayala*, 135 S. Ct. t 2197, and *Brecht v. Abrahamson*, 507 U.S. 619, 627, 637 (1993)). Comments cause actual prejudice if they had a "substantial and injurious effect or influence on the jury' verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala*, 135 S. Ct. at 2197–98.

Claims of prosecutorial misconduct are reviewed "on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citation and internal quotation marks omitted).

In addressing this claim, the Nevada Supreme held:

> We have previously held that "'[a] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or misconduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.'" Greene v. State, 113 Nev. 157, 169, 931 P.2d 54, 62 (1997) (quoting United States v. Young, 470 U.S. 1, 11 (1985)) (citations omitted).

---

[3] One of petitioner's pages in Ground 3 is out of order. Petitioner's page 7-C, which is CM/ECF page 12, appears to belong between petitioner's pages 7-H and 7-I, or between CM/ECF pages 17 and 18.

After careful review of the record, we conclude that the prosecutor's statements during closing argument do not rise to the level of reversible misconduct. Hence, we conclude that the fairness of the trial was not affected.

(Ex. 84 at 3).[4]

As a preliminary matter, the Court does not agree with petitioner that the Nevada Supreme Court found that there was a constitutional violation and thus the only question in this case is prejudice. A prosecutor's comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The Nevada Supreme Court found "the fairness of the trial was not affected," which amounts to a finding that there was no constitutional violation.[5] Accordingly, the Court considers whether the Nevada Supreme Court's conclusion that no constitutional violation occurred was objectively unreasonable.

A. Victims' Backs Were Turned

Petitioner argues that the prosecutor repeatedly asserted during closing arguments that Banks and Beach were shot in their backs, which was inconsistent with the testimony and forensic evidence that established Banks had been shot in the front. Petitioner objects to the following statements by the prosecutor:

(1) "No, this man waited purposefully, calculated, waited until the victim's backs were turned, produced the firearm and opened fire. And that's what the physical evidence tells us," (Ex. 66 (Tr. 14-15));

(2) "He waited until the moment in time in which their backs were turned, and the physical evidence tells us that. And he opened fire," (*id.* at 16);

(3) Beach and Banks were "[t]urned and walking away," (*id.* at 82);

(4) "When the two victims had their backs turned, she saw [petitioner] reach for something. … And Robin Skipworth said he pulled the gun out and fired," (*id.* at 13); and

(5) "[T]he bullet was in the back," (*id.* at 109).

---

[4] Citation is to the CM/ECF generated page number at the top of the page.

[5] It is less clear whether the Nevada Supreme Court also found that any violation was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967) (standard on direct review is whether a due process violation was "harmless beyond a reasonable doubt"). The court certainly did not find as much explicitly and, as it concluded there was no constitutional violation, it was not required to reach the question.

9

Beach was shot for the first time in his back. (Ex. 57 (Tr. 70, 95)). Banks, however, was shot in the front, not the back; the bullet entered his right lateral side and traveled in a general right to left, front to back and slightly downward direction. (Ex. 61 (Tr. 177)). Thus, at least as of the moment the bullet reached Banks, Banks' back was not toward petitioner. However, the prosecutor did not argue that Banks had been shot in the back. Rather, he argued that Banks and Beach had turned their backs to petitioner when petitioner reached for the gun. While conflicting testimony was presented at trial,[6] at least some evidence supported this inference. James Hampton testified that petitioner was south of Banks and Beach, that Banks and Beach were walking out of the park in a north to northwest direction and that Banks had just "turned like [he] had heard something or [was] motioned or … had a sense of something" when he was shot. (Ex. 58 (Tr. 166, 174-75, 178 & 182)). This testimony implicitly supports a conclusion that Banks and Beach had their backs to petitioner when petitioner reached for his gun. It "is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true." *Shaw v. Terhune*, 380 F.3d 473, 480 (9th Cir. 2004) (internal punctuation omitted). The Nevada Supreme Court's conclusion that petitioner's due process rights were not violated by the prosecutor's repeated references to the victims' backs being turned was not objectively unreasonable.

The prosecutor did, however, misstate the testimony of Robin Skipworth when he stated:

> And what did Robin Skipworth tell you? . . . When the two victims had their backs turned, she saw [petitioner] reach for something. In fact, she said he was having a difficult time getting something. . . . And Robin Skipworth said he pulled the gun out and fired.

(Ex. 66 (Tr. 13)). Skipworth never said that Beach and Banks had their backs to petitioner when petitioner pulled out his gun. Skipworth's testimony was that petitioner was standing very close to one person, who was to his east, and about four to five feet north of the

---

[6] Specifically, some of the witnesses placed petitioner north of Banks and Beach and others placed him south, but all agreed that Banks and Beach had turned and were walking in a north/northwest direction back toward their car.

other two people, who were to his south; she testified that everyone was turning around to leave and that Banks and Beach started heading in a northerly direction; she testified that Banks and Beach had to pass by petitioner to get back to their car; and she testified that Banks was facing petitioner when he was shot. (Ex. 58 (Tr. 189-97)). Far from establishing that Banks and Beach had their backs to petitioner when he pulled out his gun, Skipworth's testimony actually supported the opposite inference.

Notwithstanding this error, the state courts' conclusion that it did not so infect the trial as to render it fundamentally unfair was not objectively unreasonable. Skipworth testified that it looked like the argument had ended and that Beach and Banks "were turning to walk away" and were "leaving" when "the [petitioner] pulled out a gun." (Ex. 58 (Tr. 191-93)). She testified that while Beach and Banks would have had to pass by petitioner when walking back to their car, they at no time provoked the shooting or made any aggressive movements toward petitioner, and they did not approach him as they left. (*Id.* at 195 & 199). Skipworth's observation -- and that of virtually every other witness who observed the event[7] – was that that the conflict had ended and that Beach and Banks were leaving the scene. Stating that the victims' backs were turned is not materially different from stating that the conflict had ended and that the victims were leaving. The only evidence to the contrary was petitioner's own statements to the police that one or both of the victims came after him, which statements he did not make until prompted by the interviewing officer. In this context, a fairminded jurist could conclude that the even with the misstatement of Skipworth's testimony, the trial was still fundamentally fair.

Even if this conclusion was objectively unreasonable, however, the Court cannot find that the prosecutor's misstatement caused the petitioner actual prejudice. As just discussed, stating that the victims' backs were turned is not materially different from Skipworth's testimony that the conflict had ended and the victims were leaving. In addition, defense counsel objected to the prosecutor's argument on the grounds that "that

_____

[7] Michelle Marlette, who was called as a defense witness, did not testify that Banks and Beach were walking away, but she also did not testify that they attacked or approached the petitioner. Her testimony lacked any observations in that regard.

was not the testimony." (Ex. 66 (Tr. 13)). While the trial court did not rule on the objection at the time, it had -- just minutes before -- advised the jury that it had to decide what the testimony was. (Ex. 66 (Tr. 9)). The jury instructions also included a charge that "[n]othing that counsel say during the trial is evidence." (Ex. 65 at 14). Accordingly, in the context of the trial as a whole and that portion of the closing argument specifically, the prosecutor's misstatement of Skipworth's testimony could not have had a substantial and injurious effect on the jury's verdict.

Petitioner also takes issue with this statement by the prosecutor: "Remember, Dr. Bittker said I didn't know that the bullet was in the back. I didn't know this fact." (Ex. 66 (Tr. 109)). Although not immediately clear from the context, the prosecutor was probably referring to his cross-examination of Dr. Bittker, during which he asked Dr. Bittker if he knew that the first bullet struck Beach in his back, to which Dr. Bittker responded he did not. (*See* Ex. 64 (Tr. 47-48)). Petitioner's contention does not appear to be that the prosecutor misrepresented where Beach was shot; rather, he appears to take issue with the statement insofar as it suggests Banks was shot in the back. (*See* ECF No. 5 at 11). As noted, whose bullet the prosecutor was referring to is not clear. However, both the prosecutor and defense counsel had reminded the jury early in their arguments that Banks had been shot in the front right side. (Ex. 66 (Tr. 7 & 36)). In this context, a fairminded jurist could conclude that the "bullet in the back" statement did not so infect the trial as to render it fundamentally unfair. It was therefore not objectively unreasonable for the Nevada Supreme Court to conclude that this statement did not violate petitioner's due process.

B.  Misstating Testimony of Skipworth and Marlette

Michelle Marlette placed petitioner to the north of Banks and Beach, and Skipworth, who placed petitioner north of one and east of the other, testified that Banks and Beach had to pass by petitioner to get back to their car. Petitioner asserts that the following statement of the prosecutor misrepresented Marlette's and Skipworth's

testimony: "So why would Mr. Beach and Mr. Banks want to do anything to a man who wasn't even involved? They didn't. They walked away." (Ex. 66 (Tr. 80)).

The prosecutor did not, by way of this statement, purport to describe the testimony of either Skipworth or Marlette. Moreover, the statement is not inconsistent with their testimonies. While Skipworth told the jury that Banks and Beach had to pass by petitioner to go back to their car, she also said that they had turned around to walk away and did not approach or make any aggressive movements toward petitioner. (Ex. 58 (Tr. 193, 195 & 199)). Marlette's testimony did not include any observation about whether Banks and Beach were walking away or whether they approaching or attacking the petitioner. The objected-to statement therefore did not misstate Marlette's and Skipworth's testimony. Moreover, as discussed above, the statement had a foundation in other trial testimony. As such, the state court's conclusion that this statement did not violate petitioner's due process rights was not objectively unreasonable.

### C. Misrepresented Forensic Evidence

The forensic evidence established that Banks had been shot from within a range of zero to six feet. (Ex. 61 (Tr. 100)). Petitioner argues that the prosecutor misrepresented this evidence when during closing arguments he said "We have two guys who are standing more than 30 feet away, and he's still firing a gun at 'em, boom, boom, boom, boom." (Ex. 66 (Tr. 89)).

In context, it is clear that the prosecutor was addressing the testimony of Michelle Marlette, who stated that petitioner fired four to five shots from the basketball court. (Ex. 62 (Tr. 68)). The prosecutor specifically argued that Marlette's testimony was inconsistent with the physical evidence. (Ex. 66 (Tr. 87)). When the prosecutor stated that petitioner fired at the victims from 30 feet away, he was not asserting that that was what had actually happened. (*Id.* at 89). Even if he were, the suggestion that petitioner was firing shots at people 30 feet away is not in itself contradictory of the fact that Banks was shot at close range. The prosecutor's argument therefore did not misstate, at least not in a material way, the forensic evidence. Accordingly, the Nevada Supreme Court's conclusion that

this statement did not violate petitioner's due process rights was not objectively unreasonable.

### D. Misstated who Evinced Testimony from Marlette

During Marlette's examination, the prosecution asked her about observing petitioner carrying one of the victims to the cars. (Ex. 62 (Tr. 74)). However, during rebuttal the prosecutor stated that it was defense counsel who had asked this question. (Ex. 66 (Tr. 88)). The Court has difficulty seeing how this misstatement could have made the trial unfair or in any way impacted the jury's verdict. Who asked Marlette about petitioner carrying the victim to the car is immaterial, especially as there was other testimony in the record establishing the very same thing (including the testimony of the victim himself, Mr. Beach). In addition, defense counsel immediately objected, at which time the trial court advised the jury that it had to determine what the evidence was. *(Id.* at 89). The Nevada Supreme Court's conclusion that this statement did not violate petitioner's due process rights this claim was therefore not objectively unreasonable.

### E. Gunpowder Residue on Back of Hands

The State's expert, Nancy Rizzo, testified that she found gunpowder residue on Banks' hands, which was consistent with being shot at very close range, zero to six feet, or having been in the general vicinity where there were several rounds fired. (Ex. 61 (Tr. 100)). In rebuttal, the prosecutor argued: "[I]n order to vote not guilty, you gotta buy self-defense . . . says he's coming at him. And he's got the gunpowder, right, ladies and gentlemen, the swabbing is of the back hands. If you're in a room where a gun is fired, as you learned, you're likely to have gunpowder residue on you. It's on the backside is where they swabbed the hand." (Ex. 66 (Tr. 84)). Defense counsel objected "the same objection I made earlier," and the court responded "OK." (*Id.*)

There was no evidence in the record as to which side of the victims' hands were swabbed, a point respondents concede. The argument thus, very clearly, asserted facts not in evidence. The prosecutor's apparent insinuation was that finding residue on the back of the hands negated a claim of self-defense. However, that conclusion does not

necessarily follow. As Rizzo told the jury, a person can have gunpowder residue on them just by being in the general vicinity when several shots are fired. (Ex. 61 (Tr. 100)). Thus, the Court cannot conclude that the prosecutor's statement was so impactful on the jury's determination that it caused petitioner actual prejudice.

F.  Disparaging Remarks about Dr. Bittker

During rebuttal, the prosecutor stated: "You saw Dr. Bittker. One might wonder why he's not ever called by us here. You know why? We don't use that man. Ph.D. You've heard of that, piled higher and deeper." (Ex. 66 (Tr. 106)). Defense counsel objected, pointing out that Dr. Bittker was an M.D., not a Ph.D, and the court sustained the objection. (*Id.*)

These comments were clearly improper. However, the Nevada Supreme Court was not objectively unreasonable in concluding that they did not rise to the level of a due process violation. The trial court sustained counsel's contemporaneous objection to the Ph.D comment, neutralizing its effect. And in the overall context of Dr. Bittker's testimony, it is unlikely that the prosecutor's statement that his office did not use Dr. Bittker had much of an effect on the jury's verdict. Dr. Bittker testified that he had been used at least four times by the prosecutor's office in Clark County. (Ex. 64 (Tr. 10)). In addition, the prosecutor's aggressive cross-examination of Dr. Bittker appears to the Court far more damaging than this isolated statement in closing. Accordingly, a fairminded jurist could conclude that the trial was not rendered fundamentally unfair by the prosecutor's comments, and the Nevada Supreme Court's rejection of the claim was not therefore objectively unreasonable.

G.  Cumulative

"Even when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, '[t]he cumulative effect of multiple errors can violate due process.'" *Wood*, 693 F.3d at 1116 (quoting *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009)).

Even considering the cumulative effect of the prosecutor's comments, the Court does not find the Nevada Supreme Court's decision objectively unreasonable and does not find actual prejudice. The evidence in this case was by no means unanimous and the prosecutor was entitled to argue the theory of his case. Petitioner's self-defense case was not exceptionally strong. Apart from the petitioner's own statements that the victims had come at him, which were made only after the police suggested self-defense, there was no evidence that Banks and Beach attacked petitioner. And Dr. Bittker's testimony did not appear to be incredibly compelling. On the other hand, petitioner admitted that he went to the park as Hill's back-up and intentionally brought a loaded gun because he might need it, and there was no evidence that Banks or Beach was armed. Petitioner also chased after Beach as he was running away and continued to fire shots. This last point is probably the most damaging to petitioner's claim that he was acting in self-defense. In the context of the trial as a whole and the weight of the evidence against petitioner, a fairminded jurist could conclude that the prosecutor's cumulative statements did not violate the petitioner's due process rights. Nor does the Court have any grave doubt that these errors had a substantial and injurious effect on the jury's verdict.

Petitioner is therefore not entitled to relief under Ground 3.

## II. Ground 4

At trial, petitioner sought to introduce specific, prior bad acts of both Banks and Beach. The trial court deemed the evidence inadmissible but allowed introduction of opinion and reputation testimony as to Banks' and Beach's characters. Petitioner asserts that the trial court's refusal to allow evidence of the victims' specific acts pursuant to Nevada Revised Statutes § 48.055(2) violated his right to a fair trial and due process. [8]

In addressing this claim, the Nevada Supreme Court held:

> Next, Brown argues that he should have been allowed to present reputation and opinion evidence, as well as specific act evidence, regarding the propensity for violence of the victims pursuant to NRS 48.045. Brown claims that the character of the victims is an essential element in a self-defense

---

[8] The Court notes that while petitioner also labels this (and several other of his claims) as a Sixth Amendment "counsel" claim, (see ECF No. 5 at 22), Ground 4 does not state a cognizable denial of counsel claim.

theory and, therefore, is an exception to the general rule against the admissibility of character evidence.

NRS 48.045 provides, in relevant part:

> 1. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion except:
>
> …
>
> (b) Evidence of the character or trait of character of the victim of the crime offered by an accused, subject to the procedural requirements of NRS 48.069 where applicable, and similar evidence offered by the prosecution to rebut such evidence . . .

However, character evidence must be relevant before it is admissible. We have held that "'[t]he character of the deceased can only be brought in issue where the circumstances are such as to raise a doubt whether the homicide was committed in malice or was prompted by the instinct of self-preservation.'" Coombs v. State, 91 Nev. 489, 490, 538 P.2d 162, 162 (1975) (quoting State v. Pearce, 15 Nev. 188, 191 (1880)).

Moreover, the form or proof of character evidence "may be established by testimony as to reputation or in the form of an opinion. The character of the victim cannot be established by proof of specific acts." Burgeon v. State, 102 Nev. 43, 46, 714 P.2d 576, 578 (1986) (footnote omitted). However, "specific acts which tend to show that the deceased was a violent and dangerous person may be admitted, provided that the specific acts of violence of the deceased were known to the accused or had been communicated to him." Id. at 45-46, 714 P.2d at 578. NRS 48.045(1)(b) permits the admission of the deceased victim's general character offered by the accused whether the accused has knowledge of the victim's character or not. See id.

Here, Brown concedes that he did not previously know the specific acts of violence of the victims that he sought to introduce. Thus, we conclude that the victim's specific acts of violence are not admissible pursuant to Burgeon to establish the reasonableness of Brown's fear or his state of mind. We conclude, however, that opinion testimony and evidence of the victim's general reputation were admissible. After review of the record, we conclude that Brown did not attempt to introduce opinion testimony or evidence of the victims' general reputation; therefore, there is not district court error to address.

Brown attempts to distinguish Burgeon by arguing that the character of the victim is an essential element of his claim of self-defense, thereby falling under NRS 48.055(2). [footnote 1 omitted]. Brown cites to many authoritative treatises and case law from other jurisdictions to support his contention that character evidence of a victim is allowed in claims of self-defense.

We conclude that Brown's reliance on such authority is misplaced. Although the authority cited by Brown does suggest that pertinent character evidence of the victim is admissible when establishing self-defense, such evidence may only take the form of reputation and opinion testimony. Here, Brown attempted to introduce evidence of specific acts of violence of the victims. Thus, we conclude that due to the form of the evidence, it was inadmissible.

17

> Furthermore, we conclude that the character of the victim is not an essential element of self-defense. <u>See</u> NRS 200.120. The accused need only establish that the victim was manifesting violence tendencies on that particular occasion. The accused need not establish that the victim had a violence character before that fatal point in time. Thus, we conclude that Brown's argument lacks merit.

(Ex. 84 at 3-5) (footnotes omitted).[9]

"[I]t is not the province of the federal habeas court to reexamine state court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). Therefore, as a general rule, federal courts may not review a trial court's evidentiary rulings. *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process. *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (The federal court's "role is limited to determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process."). Habeas relief is thus available only if an evidentiary ruling or rule was arbitrary, disproportionate to the end it was asserted to promote, or so prejudicial that it rendered the trial fundamentally unfair. *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.1995).

Petitioner concedes that under Nevada law, specifically Nevada Revised Statutes § 48.045 and *Burgeon v. State*, 714 P.2d 576 (Nev. 1986), specific acts of conduct were not admissible unless the victim's character was an essential element of self-defense. *See* Nev. Rev. Stat. § 48.055(2) (providing that "[i]n cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof of specific instances of the person's conduct may be made on direct or cross-examination"). What petitioner appears to take issue with is the Nevada Supreme Court's conclusion

---

[9] The Court notes that although the Nevada Supreme Court held that petitioner did not attempt to introduce reputation and opinion testimony, in fact petitioner was allowed to present reputation and opinion testimony and did so. (*See* Ex. 64 (Tr. 126-29, 131-32, 133-34, 166, 168)).

that a victim's character is not an essential element of a defense of self-defense. However, Nevada is far from alone in concluding that a victim's character is not an essential element of a self-defense claim. *See, e.g.*, *United States v. Keiser*, 57 F.3d 847, 857 (9th Cir. 1995) ("Even had Keiser proven that Romero is a violent person, the jury would still have been free to decide that Romero was not using or about to use unlawful force, or that the force Romero was using was not likely to cause death or great bodily harm, or that Keiser did not reasonably believe force was necessary, or that he used more force than appeared reasonably necessary. On the other hand, a successful defense in no way depended on Keiser's being able to show that the Romero has a propensity toward violence."). That conclusion can therefore not be said to be arbitrary, disproportionate or fundamentally unfair.

But even assuming that Nevada's evidentiary position in this regard violated petitioner's due process rights, such error would subject to harmless error analysis, *Crane*, 476 U.S. at 691, meaning that petitioner would be entitled to habeas relief only if the error has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Here, there was no prejudice. The jury was presented with several witnesses who testified as to the victims' characters generally. Several people testified that Beach was the type of person to carry guns, that he often threatened people, and that he liked to frighten people. (Ex. 64 (Tr. 126-29, 131-34)). One witness testified that Banks was "absolutely the most evil human I have ever met, totally," explaining that he had terrorized her family for years. (Ex. 64 (Tr. 166, 168)). In addition, the evidence was fairly clear that during their altercation Beach repeatedly told Hill that he wanted to fight and verbally challenged both Hill and petitioner (*See* Ex. 57 (Tr. 99); Ex. 56 at 11). The jury thus had substantial evidence with which to conclude that Banks and Beach were violent or aggressive people and even that they were acting in an aggressive manner that night. Petitioner has not established that there is more than a reasonable possibility that the jury's verdict would have been different had it been

presented with Banks' and Beach's prior bad acts.[10] Thus, the lack of such evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict."

Petitioner is not entitled to relief on Ground 4.

III.     Ground 5

In Ground 5, petitioner asserts that his rights to due process and a fair trial[11] were violated when the trial court refused to give his proposed jury instructions on self-defense. Petitioner identifies several self-defense instructions rejected by the Court, apparently arguing that they all should have been given. (ECF No. 5 at 26-28). The proposed instructions included language that self-defense can occur when defending another or to prevent a felony. In rejecting this claim, the Nevada Supreme Court held:

> Third, Brown argues that the trial court committed reversible error when it refused to allow Brown's proposed jury instructions pertaining to self-defense. Brown also argues that the jury should have been instructed on the theories of self-defense and prevention of a felony.
>
> "A defendant in a criminal case is entitled, upon request, to a jury instruction on his or her theory of the case, so long as there is some evidence, no matter how weak or incredible, to support it." Ruland v. State, 102 Nev. 529, 531, 728 P.2d 818, 819 (1986) (citations omitted). However, if a proffered jury instruction "misstates the law or is adequately covered by other instructions, it need not be given." Barron v. State, 105 Nev. 767, 773, 783 P.2d 444, 448 (1989).
>
> We conclude that the district court did not err by refusing to give Brown's proposed jury instruction because the jury instructions given by the district court accurately stated Nevada law. We also conclude that the district court properly refused to instruct the jury regarding defense of others and prevention of a felony because there was no evidence in the record to support such instructions.

---

[10] Defense counsel sought admission of the following prior bad acts: (1) on April 22, 1993, Banks threatened his mother with a knife for not giving him money for school; (2) on February 18, 1994, Banks stole $8,000.00 worth of jewelry and other items and later told the victim's son that anyone who told would be "shot or beat up," (3) on February 14, 1993, Banks was charged with a curfew violation and possession of a deadly weapon – a four-inch knife with a double blade; (4) on December 30, 1991, Banks stole a 1991 Honda vehicle; (5) on March 31, 1991, Banks stole a Kawasaki motorcycle; (6) on October 1, 1988, Banks attempted to steal an air pistol from a Target store; (7) on June 12, 1996, Beach threatened two people with a handgun, telling them he "had a cap for their ass"; (8) Beach was a member of a gang; (9) on December 19, 1991, Beach had in his possession a "BB" at school and was firing the weapon into the school building; (10) on February 26, 1991, Beach was found to be carrying a large Buck knife and two other pocket knives at school; (11) on November 12, 1993, Beach challenged a car full of adolescents to a fight and when they refused he hurled rocks at their car; and (12) on October 29, 1994, Beach was charged with possession of marijuana. (Ex. 56).

[11] See supra n.8.

(Ex. 84 at 5-6).

To obtain federal habeas relief based on an improper jury instruction, petitioner must establish that the instruction so infected the entire trial that the resulting conviction violates due process. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir.1993); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The question is whether the instructional "error, in the whole context of the particular case, had a substantial and injurious effect on the jury's verdict." *Calderon v. Coleman*, 525 US. 141, 147 (1998). Where a petitioner alleges that the trial court refused to give an instruction, his burden is "especially heavy"; "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155. In reviewing jury instructions, the court inquires as to whether the instructions as a whole were misleading or inadequate to guide the jury's deliberation. *United States v. Garcia–Rivera*, 353 F.3d 788, 791 (9th Cir. 2003) (citing *United States v. Frega*, 179 F.3d 793, 806 n. 16 (9th Cir.1999) (internal citations omitted). "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" *Boyde v. California*, 494 U.S. 370, 378 (1990). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

The Court has reviewed the petitioner's proposed instructions and compared them to the instructions given by the trial court. With the exception of the proposed instructions on defense of another and prevention of a felony, the instructions sought by petitioner were substantially the same as those given by the trial court. Petitioner cannot establish a due process violation on these grounds, and thus the Nevada Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Insofar as the instructions on defense of another and prevention of a felony are concerned, the Nevada Supreme Court's conclusion that there was no evidence of either was also not objectively unreasonable. There *was* no evidence that either Banks

or Beach were going to attack Hill or commit another felony. In fact, all the evidence supported a conclusion that the altercation between Beach and Hill had come to an end.

Petitioner is therefore not entitled to relief on Ground 5.[12]

IV.    Ground 6

In Ground 6, petitioner alleges that his rights to due process and a fair trial were violated because the trial court refused to give an instruction regarding the prosecution's burden of proof. (ECF No. 5 at 30). Specifically, the trial court declined to give the following proposed instruction: "The state must prove beyond a reasonable doubt the facts necessary to support every element of the charged crime." (*Id.*) At trial, the court gave several instructions regarding the burden of proof, including Instruction 18, which provided that the State bore the burden of proving every element of the crime beyond a reasonable doubt, and Instruction 35, which provided that the State also bore the burden of establishing beyond a reasonable doubt a lack of justification, *i.e.* that the defendant was not acting in self-defense. (Ex. 65 at 20 & 38).

In rejecting this claim, the Nevada Supreme Court held:

> Finally, Brown argues that his proposed jury instruction regarding the State's burden of proof is far clearer than that given by the district court; therefore, failure to use the proffered instruction warrants reversal.
>
> "Jury instructions should be clear and unambiguous." Culverson v. State, 106 Nev. 484, 488, 797 P.2d 238, 240 (1990). Here, the jury was instructed that "[t]he State must prove all elements of the crime, including lack of justification, beyond a reasonable doubt." We hold that such instruction comports with Nevada law and properly instructs the jury that the State has the burden of proving that Brown did not act in self-defense. Thus, we conclude that Brown's argument is without merit.

(Ex. 84 at 6-7).

The Nevada Supreme Court's rejection of petitioner's claim regarding the burden of proof instruction was not contrary to or an unreasonable application of clearly established United States Supreme Court law, nor was it based on an unreasonable determination of the facts. There is virtually no difference between the instruction

---

[12] The Court notes that in answering Ground 5, respondents discuss petitioner's related claim, Ground 1A. The Court will address those arguments in the context of Ground 1A.

petitioner argues the trial court should have given and the ones that it gave. Both placed the burden of proof on all elements on the State.

Accordingly, petitioner is not entitled to relief on Ground 6.

V.      Ground 17

In Ground 17, petitioner alleges that his rights to a fair trial, due process and effective assistance of counsel were violated when counsel failed to move to dismiss the grand larceny charge after the Justice Court abused its discretion by binding petitioner over to trial court based on a "substantial mistake of fact." (ECF No. 5 at 69). Petitioner asserts that inclusion of the grand larceny charge during trial "implied that [he] was a bad or evil person, which inflamed the passions of the Jury." (*Id.*)

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief—deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* at 696.

Petitioner raised the claim in Ground 17 in his first state habeas petition. The district court rejected the claim, and the Nevada Supreme Court affirmed. (Exs. 117 & 159). The district court's decision is the last reasoned state court decision, and the Court therefore considers its analysis in evaluating petitioner's claim. *See Murray v. Schriro*, 2018 WL 891266, at *17 (9th Cir. Feb. 14, 2018). In rejecting petitioner's claim, the district court stated:

> The court finds that no legitimate grounds for pre-trial dismissal were available to counsel. The court further finds that the facts supporting the charge, that Brown drove off from the scene of the shooting in the victim's car, would have been admissible as part of the res gestae of the crime.

(Ex. 117 at 4).

The state courts' determination of this claim was not objectively unreasonable. Petitioner points to Beach's testimony at the preliminary hearing in which, when asked whether he gave the petitioner permission to take his car, he responded "I guess. I gave him the keys." (Ex. 3 (Tr. 43-44)). Petitioner also cites Beach's testimony later in the preliminary hearing when he said that petitioner did not point the gun at him while they were on the porch. (*Id.* at 51). Finally, petitioner cites part of the prosecutor's rebuttal argument in which he stated: "Ladies and gentlemen, you never have the right to use deadly force with a handgun." (Ex. 66 (Tr. 108-09)). All of this, he appears to argue, suggests that Beach voluntarily gave petitioner his car and therefore there was no larceny.

A defendant commits grand larceny of the person when he "[i]ntentionally steals, takes and carries away, leads away or drives away . . . [p]ersonal goods or property, with a value of $650 or more, owned by another person." Nev. Rev. Stat. § 205.220(1)(a). The standard for binding over a defendant on a criminal charge is low; a "defendant may be bound over for trial if the evidence adduced is sufficient to establish probable cause that a crime has been committed and the defendant has committed it" and the "finding of probable cause may be based on slight, even 'marginal' evidence." *Sheriff v. Lyons*, 607 P.2d 590, 591 (Nev. 1980). There was evidence adduced that petitioner took Beach's car from his person, after shooting him and possibly under threat of the gun. It was therefore not an abuse of discretion for the Justice Court to bind petitioner over on the larceny charge.

Nor was the state court objectively unreasonable in concluding that defense counsel was not ineffective for failing to file a motion to dismiss the larceny charge. Counsel testified at petitioner's postconviction hearing that he did not consider filing a motion to dismiss because there was evidence that petitioner had a car that was not his;

while he did consider a motion to sever, he concluded it was not likely to succeed as the alleged larceny was part of the same series of acts charged in the indictment. (Ex. 115 at 22-23). Counsel's performance was not outside the wide range of reasonable representation. However, even if it were, petitioner cannot establish prejudice. Petitioner was acquitted of the larceny charge. Moreover, although petitioner argues that the admission of the evidence of the alleged larceny prejudiced him with respect to the other charges, the evidence would have come in regardless because it was part of the same criminal episode.

Petitioner is not entitled to relief on Ground 17.

## VI.    Ground 1A

In Ground 1A, petitioner asserts that his Sixth and Fourteenth Amendment rights were violated when the state court denied his habeas claim that he was improperly denied a jury instruction critical to his theory of the case. (ECF No. 19 at 9). Petitioner's argument is based on *Boykins v. State*, 995 P.2d 474 (Nev. 2000), which the Nevada Supreme Court decided after his conviction became final.

In rejecting this claim, the state trial held:

> The focus of the hearing was on the <u>Boykins</u> decision. Brown took the position that <u>Boykins</u> altered the law. In <u>Hill v. State</u>, 98 Nev. 295, 647 P.2d 370 (1982), the Court ruled that the defense requests not only that the defendant perceive a mortal threat but that the perception must be objectively reasonable as well. 98 Nev.at 297. Brown took the position that the Boykins Court repudiated <u>Hill</u> and held that the defense is entirely subjective. Thus, Brown argued that this court erred in refusing the instructions proffered by [counsel] at the trial.
>
> The State took the position that <u>Boykins</u> did not alter the law of self-defense and that the decision concerned only the error in giving an inappropriate limiting instruction. Thus, the State took the position that the objective element of a claim of self-defense remains intact.
>
> The court finds it unnecessary to resolve the debate concerning the significance of <u>Boykins</u>. In affirming the conviction, the Supreme Court ruled that this court did not err in rejecting the proffered instructions. That ruling is the law of the case. <u>McNelton v. State,</u> 115 Nev. ___, 990 P.2d 1263, 1275 (1999); <u>Flanagan v. State</u>, 112 Nev. 1409, 1422, 930 P.2d 691, 699 (1996) (propriety of jury instructions not revisited due to "law of the case."); <u>Valerio v. State</u>, 112 Nev. 383, 387, 915 P.2d 874, 876 (1996). Brown's conviction was final before Boykins was issued and thus that decision is not available to him.

> This court also finds that Brown suffered no prejudice from the lack of the proffered instruction. Brown's mental state at the time of the killing was thoroughly explored and argued before the jury. The evidence at trial revealed that Brown took a loaded gun to an anticipated altercation. He shot two unarmed men. Brown chased one man across the park, shooting at him. The evidence that his hypoglycemia actually led him to reasonably perceive a mortal threat from these men was ambiguous at best. The court notes, however, that the evidence was skillfully presented and argued by [counsel] but the effect of the evidence was a conviction for second degree murder. This court is not persuaded that an additional instruction concerning the effect of the evidence would have altered the outcome.

(Ex. 117 at 4-6).

As discussed above, to obtain federal habeas relief based on an improper jury instruction, petitioner must establish that the instruction so infected the entire trial that the resulting conviction violates due process. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir.1993); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). The question is whether the instructional "error, in the whole context of the particular case, had a substantial and injurious effect on the jury's verdict." *Calderon v. Coleman*, 525 US. 141, 147 (1998). Where a petitioner alleges that the trial court refused to give an instruction, his burden is "especially heavy"; "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*, 431 U.S. at 155.

Petitioner's basic argument is that, in line with *Boykins*, he was entitled to a jury instruction that, in assessing whether a reasonable person would have perceived a threat, a "reasonable person" was one suffering from a diabetes-related insulin reaction. (ECF No.19 at 12). The import of *Boykins* is unclear, but it is unnecessary for this Court to decide. The state court concluded that petitioner was not prejudiced by the lack of such an instruction. This conclusion was not objectively unreasonable.

The jury was instructed to consider whether "a reasonable person in like circumstances would believe that such immediate danger exists." (Ex. 65 at 39). Thus, the jury was instructed to consider the petitioner's circumstances.[13] The jury was

---

[13] The Court additionally notes that the instruction is substantially similar to one of several self-defense instructions approved by the Nevada Supreme in its decision *Runion v. State*, 13 P.3d 52 (Nev. 2000), which was issued after *Boykins*.

presented evidence that petitioner might have been suffering from an insulin reaction the night of January 18, 1996, but that evidence was by no means conclusive. In light of the evidence presented at trial, it was not objectively unreasonable for the state court to conclude that petitioner was not prejudiced by the lack of an instruction tailoring the reasonable person standard to petitioner's specific medical circumstances.

Petitioner is not entitled to relief on Ground 1A.

**Certificate of Appealability**

In order to proceed with an appeal, petitioner must receive a certificate of appealability. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski,* 435 F.3d 946, 950-951 (9th Cir. 2006); s*ee also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Id.;* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *Id.* When the defendant's claim is denied on procedural grounds, a certificate of appealability should issue if the petitioner shows: (1) "that jurists of reasons would find it debatable whether the petition states a valid claim of the denial of a constitutional right"; and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).

This court has considered the issues raised by petitioner, with respect to whether they satisfy the standard for issuance of a certificate of appealability, and determines that none meet that standard. The court will therefore deny petitioner a certificate of appealability.

**Conclusion**

In accordance with the foregoing, IT IS ORDERED that the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 5 & ECF No. 19 at 9-15) is hereby DENIED on its merits, and this action is DISMISSED with prejudice.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

The Clerk of the Court shall close this action and enter final judgment accordingly.

DATED THIS ___26___ day of ___March___, 2018.

_____
GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE